UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re Petition of:                                    Case Number 18-51223

UAW-CHRYSLER SKILL DEVELOPMENT            Honorable Paul D. Borman
AND TRAINING PROGRAM,

In the Matter of:

UNITED STATES OF AMERICA,                  Case Number 17-20406

    v.

D-2 ALPHONS IACOBELLI,

    Defendant.
_____/

## RESPONSE TO THE NTC'S SUPPLEMENTAL BRIEF

DAVID A. GARDEY
ERIN S. SHAW
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9100

## INTRODUCTION

The NTC has admitted that it does not accumulate financial assets or resources, and that its only financial function is to "pass-through" FCA funds. The Court's hunch that the NTC is a "shill" for FCA could not be more apt. The NTC still cannot establish that the crime of conviction is a crime against property or that it suffered a loss. In insisting that this Court cannot deny its restitution claim unless the United States establishes that the NTC "made dough," the NTC misstates the law and ignores the fact that it exists at the absolute behest of FCA and the UAW. The MVRA was not designed to redistribute resources among bad actors, and this Court should decline the invitation to do so. Such an exercise of the Court's discretion is most appropriate, given the NTC's pending civil action which, as the Court already acknowledged, "really deals with what we're about here." We elaborate below.

## ARGUMENT

**I.    The MVRA Does Not Apply.**

    **A.    Conspiracy to Violate the Taft-Hartley Act Is Not a Crime Against Property.**

The NTC has abandoned its fraud theory, and its only remaining argument is that it is a victim of the Taft-Hartley conspiracy.[1] The NTC claims that it is entitled

---

[1] The NTC conceded at oral argument that "there's no ability for the NTC to recover" from Iacobelli on a fraud theory "other than the civil case which has been filed," and that the NTC was "seeking recovery in civil court" for fraud, "but we

1

to restitution because its "funds were stolen." The NTC concedes it cannot obtain restitution for fraud because Iacobelli "was never charged in a fraud." Hrg. Tr. at 12. By the same measure, the NTC cannot obtain restitution for the uncharged crime of theft. *See* Govt. Resp. at 11-12.

The NTC's reliance on *United States v. Collins*, 854 F.3d 1324 (11th Cir. 2017) is misplaced. First, the *Collins* court expressly stated that "there may be a question about whether bribery is 'an offense against property' under the MVRA." *Id*. at 1335; *see also United States v. McNair,* 605 F.3d 1152, 1221(11th Cir. 2010) ("We *sua sponte* note there is a potential issue of whether bribery is 'an offense against property' covered by §3663A(c) and whether the MVRA applies to bribery crimes.") Second, *Collins* is factual distinguishable. Collins was a bank employee who pled guilty to conspiracy to accept gratuities with the intent to be influenced or rewarded in connection with a bank transaction. The issue was whether the bank was entitled to restitution for those bank transactions, and there was no suggestion of unclean hands. The plain language of the crime of conviction in *Collins* expressly anticipated the bank transactions; indeed the only reason Collins was paid off was to influence them. There is no similar situation here.

---

can't do it in this proceeding because he was never charged in a fraud, with a fraud against the NTC or anyone else." Hrg. Tr. at 6, 12-13; *see also id*. at 18, 48-49.

**B.     The NTC Suffered No Pecuniary Loss.**

**1. The Company's Only Obligation Was to "Make Available Funding."**

The 2007 and 2011 Memoranda of Understanding on Joint Activities (commonly known as "M-9s") between the Company[2] and the UAW govern the time period in the conspiracy set forth in Iacobelli's indictment (2009 to mid-2015). The operative language is that "the ***Company will make available funding***" at a specified rate of five cents per hour worked. NTC Ex. 2 at PgID 274; NTC Ex. 3 at PgID 283-284; *see also id*. ("the Company will make available additional funding" in connection with overtime hours worked).[3] Notably, the M-9s do not designate the NTC as the entity to whom the Company must make funding available. All the Company had to do under the M-9 was "make funding available" upon request. This was nothing more than a potential obligation until the draw request was made. FCA accounted for this potential obligation by booking the monthly nickel fund allocation as an expense and recording it as a liability on its balance sheet. When the NTC

---

[2] The Company was Chrysler LLC in 2007 and Chrysler Group LLC in 2011. The predecessor entity was Chrysler Corporation. The successor entity is FCA US LLC.

[3] At oral argument, the Court suggested that the Company "got a nickel back from all the employees." Hrg. Tr. at 56. To clarify, a nickel per hour worked was never docked from employee paychecks to fund the NTC. Rather, the Company "made available" its own income.

3

made draw requests and money was paid out from FCA's general cash account, the liability decreased.

### 2. The NTC Disclaimed Ownership of the Funds that FCA Makes Available to It in a Recent Department of Labor Investigation.

The NTC admitted what "make available funding" means in the M-9 during the course of a Department of Labor investigation that was opened in 2014 to determine whether the NTC was an "employee welfare benefit plan" within the meaning of ERISA.[4] The NTC twice stated that it does not have any accumulated financial assets or resources. *See* Govt. Ex. B at 1, 3 ("The Center is financed exclusively by means of monthly cash transfers made directly by the Company. … the Center does not accumulate financial assets over time."); Govt. Ex. C at 2 ("[T]he Center did not accumulate material amounts of financial resources and hold them over from year to year. Rather, as indicated in the [M-9], the formula based funding amounts were "made available" for Center programs."); *see also id.* ("Accordingly, the use of the term 'Funds' in the [M-9] does not connote - as the term sometimes does in other contexts - any standing, fixed corpus of assets - much less a trust.") The NTC was particularly adamant that Tuition Assistance Program (TAP) funds were not NTC assets or resources:

---

[4] A determination that ERISA applied to the NTC would have triggered significant reporting obligations on the NTC's part.

4

> Like all other Activities, the TAP is not "funded," within the meaning accorded that term under ERISA. Money for this Activity is not segregated; no participant has any right to any assets of the Center (or of the Company) with respect to this Activity. ***Amounts required to provide reimbursement under the TAP are simply forwarded***, within approximately a month of the need, ***to the Center***, whose role is at most as an "administrator" of the Plan. There is no authority for treating such an arrangement, where the ***employer forwards its own unsegregated assets to an administrator for the short-term purpose of administering benefits, as "funded"*** - and indeed, doing so would be tantamount to regarding any third-party plan administrator as itself an ERISA "plan."

*Id.* (emphasis supplied). The NTC position was that such money was, at all times, still FCA's – even after it was transferred into the NTC bank account. Indeed, in the same submissions, the NTC discussed the "pass-through effect of this financing system." Govt Ex. B at 3; *see also id*. at 6 (referring to self as a "'pass-through' entity"); *see also id*. at 5 ("the Center could, as a matter of logic, at most be only 'a method of implementing a plan, fund, or program'"). The NTC's self-characterization as an "administrator," "pass-through," and "method" supports the Court's observation that the NTC may have been a "shill" for FCA. Hrg. Tr. at 6, 44, 61.

### 3. The Company and the UAW Had the Exclusive Authority to Dispose of Unused Funds.

The M-9s state that the Company and the UAW maintain the exclusive authority to decide how to distribute any surplus funds:

5

> After reconciliation of claims, commitments, and accruals through the expiration date of the new National Agreement, remaining National and Reservoir Funds *shall be disposed of in such a manner as the parties shall agree* consistent with the objectives of this Memorandum.

NTC Ex. 2 at PgID 275; NTC Ex. 3 at PgID 285 (emphasis supplied). Likewise, the Company and the UAW had the express power to discontinue any part of the M-9 if they so agreed, as well as make adjustments and modifications to it. *See* NTC Ex. 2 at PgID 275, 277; NTC Ex. 3 at PgID 286, 288; NTC Ex. 4 at PgID 295, 299.

The NTC reserve balance at the end of fiscal year 2014 was approximately $34.1 million. *See* Govt. Ex. D. In August 2015, through their powers under the M-9 discussed above, NTC Co-Chairmen UAW Vice President Norwood Jewell and FCA Vice President Glenn Shagena agreed to significantly diminish this large and unclaimed NTC surplus. *See* Govt. Ex. E. They essentially agreed to wipe out the existing reserve balance and reset it at just 25% of the fiscal year 2015 surplus. *Id*. at 2 ("As of December 31, 2015, the initial liability on the Company's books will equal 25% of the difference between fiscal year 2015 actual expenses and the amount calculated using the formula.") This agreement allowed for the return of the multi-million dollar prior reserve balance and 75% of the fiscal year 2015 surplus to FCA income. It also set a 25% cap on the NTC's annual access to surplus funds going forward. *See id*. at 1 ("Annually, 25% of the difference between the amount

6

calculated using the formula and actual expenditures shall be recorded as a liability on the Company's books.")

## II. The Equities Favor Denial of the NTC's Motion.

In *United States v. Emor*, 850 F. Supp. 2d 176, 204 (D.D.C. 2012), the court addressed whether SunRise Academy, a private school for special needs students incorporated as a nonprofit, could recover restitution from its founder after he pled guilty to one count of wire fraud for misusing government funds provided to SunRise for educational purposes. SunRise had students and classes actually took place. The court determined that although SunRise met the MVRA's statutory definition of victim, it was undeserving of restitution because SunRise was both the alter ego of Emor and his unindicted coconspirator. *See id.* at 204-211.

On the latter point, although SunRise was never charged, the court found ample support that SunRise nevertheless "participated in" Emor's crimes -- without applying the NTC's recommended benefit test or determining that SunRise made any profit. *See id.* at 209 (*citing Reifler & Lazarenko*). One of the most important factors was the knowledge and facilitation of the crimes by the members of SunRise's Board and a lack of independent corporate governance. The NTC board shared similar governance failings, and five former JAB members stand convicted.

7

In discussing the alter ego theory, the court also acknowledged that while a corporation is ordinarily to be viewed as a distinct entity, this concept is "designed to serve normal, inoffensive uses of the corporate device, and is not to be stretched beyond its reason and policy." *Id*. at 204 (*citing Quinn v. Butz,* 510 F.2d 743, 757 (D.C. Cir.1975)).  It noted "the essence of the alter ego doctrine is not about the ownership of shares, or formalities of any kind, but is instead about control," more specifically, whether the corporation "is in fact the alter ego or business conduit ***of the person in control***." *Id*. at 207 (*citing Labadie Coal Co. v. Black*, 672 F.2d 92, 97 (D.C. Cir. 1982) (emphasis in original). "[W]hen the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." *Id*. at 204 (*citing Quinn*).

The NTC's insistence that it should be evaluated using traditional principles of corporate liability operates from the faulty premise that the NTC is an independent organization.  But the NTC is a "joint enterprise between FCA and the UAW," created for the their mutual benefit and under their total control.  *See* Mickens Plea Tr. at 17.  Every dollar for NTC operations comes from FCA.  Decisions about how to spend money at the NTC were made by officials at FCA.  *See id*.  at 17-18.  The M-9s further demonstrate that the NTC is absolutely limited in what it can do by the circumstances of its creation.  It has no power of self-determination.  Its board was

8

hand-selected by FCA and the UAW to represent and protect their respective interests. Most significant, if the corporation dissolved, the NTC would still exist under the M-9. But if FCA and the UAW exercised their authority under the M-9 to discontinue the NTC, it would be shuttered. At oral argument, when NTC counsel bemoaned that he had not seen the benefit, the Court had no trouble understanding: the benefit was to FCA, and the NTC was its shill. *See* Hrg. Tr. at 43-44.

Even if NTC's *respondeat superior* theory applies, *Carter* requires only "some connection with the furtherance of the business" of the corporation – not a benefit. *United States v. Carter*, 311 F.2d 934, 942 (6th Cir. 1963). Notwithstanding the illegal conduct of most of its members, the JAB still had the broad authority to conduct the NTC's daily business. This included making charitable donations on behalf of the NTC and contracting with vendors. Consistent with that broad authority, JAB members approved donations of approximately $380,000 to General Holiefield's foundation and selected Monica Morgan as the exclusive provider of over $600,000 worth of "trinkets and trash" from her various businesses. These actions have "some connection with the furtherance of the business" of the NTC. They also form the predicate for the NTC's criminal liability. The NTC illegally helped FCA do indirectly something that FCA could not do directly – provide money and things of value to union officials. The benefit to the NTC was preservation of its

very valuable 501(c)(5) tax-exempt status. Every tax year from 2009 to 2014, Durden filed misleading Form 990 returns on the NTC's behalf to cover up nearly $1 million in related party transactions with LTLOF and Monica Morgan in order to conceal the NTC's ongoing role as a co-participant from the IRS and other potential government investigators.

## CONCLUSION

This matter is before the Court in a continuation of a sentencing for one individual in an ongoing and complex prosecution in which many individuals and entities remain under investigation. Provision of a restitution award to the entity at the epicenter of the criminal activity in the middle of the case could lead to incongruous results. The United States respectfully requests that the motion be denied. Should the Court disagree and grant the motion, the NTC concedes: "That doesn't preclude the government from doing whatever they want in terms of the NTC as a co-conspirator or charging it or whatever." Hrg. Tr. at 20.

                                              MATTHEW SCHNEIDER
                                              United States Attorney

                                              *s/ Erin S. Shaw*
                                              ERIN S. SHAW
                                              DAVID A. GARDEY
                                              Assistant United States Attorneys
                                              211 W. Fort Street, Suite 2001
                                              Detroit, MI 48226
Dated: March 1, 2019                     Phone: (313) 226-9100

# CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2019, I caused the foregoing document to be electronically filed with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Counsel of Record for Alphons Iacobelli

Counsel of Record for the UAW-Chrysler Skill Development and Training Program

                                                *s/ Erin S. Shaw*
                                                Assistant United States Attorney
                                                211 W. Fort Street, Suite 2001
                                                Detroit, MI  48226
                                                Phone:  (313) 226-9182
                                                E-Mail:  erin.shaw@usdoj.gov