Andrew Stumpff
andrew@skalaw.com
734.747.7050 ext. 113



STEVENSON
KEPPELMAN
A S S O C I A T E S

▽

444 S. MAIN STREET
ANN ARBOR, MICHIGAN 48104-2304

*tel:* 734-747-7050
*fax:* 734-747-8010

w w w . s k a l a w . c o m

October 20, 2014

*via: email & overnight delivery*

Ms. Susan Gilmore Fultz
Deputy Regional Director
Employee Benefits Security Administration
Ft. Wright Executive Building 1
1885 Dixie Highway
Ft. Wright, KY 41011-2664

**CONFIDENTIAL**

*Re:    UAW-Chrysler National Training Center*

Dear Ms. Fultz:

We are writing on behalf of our client UAW-Chrysler National Training Center (the "Center"), in response to your August 7, 2014 letter to Mr. Jerome Hill, Counsel for the Center.

Your letter indicates that pursuant to the Secretary of Labor's authority under the Employee Retirement Income Security Act of 1974 ("ERISA"), the Employee Benefits Security Administration ("EBSA") seeks to undertake an investigation of the Center, including review of a number of documents listed in your letter and interviews with representatives of the Center, which the letter characterizes as an employee benefit plan.

As we have described in intervening telephone conversations with EBSA Investigator Meghann Wilkinson, it is the Center's position, based on the factual circumstances concerning its structure and operation, that the Center is not an "employee benefit plan" within the meaning of ERISA, and hence does not fall within the jurisdiction of EBSA. The Center exists as part of a protocol for cooperation between International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") and Chrysler Group LLC (the "Company") in conducting various activities, none of which, nor the Center itself, constitutes an employee benefit plan. Accordingly, jurisdiction for the investigation proposed in your letter is lacking, and we request that EBSA's request be withdrawn.

*Lansing Office:*
120 N. Washington Square #805
Lansing, MI 48933
*tel:* 517 324•4222

00508546.DOC-4    A T T O R N E Y S   P R A C T I C I N G
P E N S I O N   A N D   E M P L O Y E E   B E N E F I T S   L A W

Page 2
October 20, 2014

This letter is intended, at Ms. Wilkinson's request, to describe and substantiate the factual and legal basis for the above conclusion in detail, with supporting documentation.

Because the Center's activities are diverse, a complete analysis requires enumerating and providing analysis for each such activity separately regarding its status under ERISA's definition of "employee benefit plan." This response proceeds by, first, providing a brief description of the Center's background and history, followed by a summary of relevant legal authorities. A detailed enumeration of the the Center's activities is then presented, with analysis as to the status of each such activity under ERISA's definition of "employee benefit plan." Finally, attached to this letter is a set of exhibits, comprising documents that support the factual descriptions in the letter itself, and which are referenced where appropriate herein.

## THE CENTER: BACKGROUND AND DESCRIPTION

The Center was organized in 1986 as a not-for-profit corporation, pursuant to a Memorandum of Understanding (the "MOU") between UAW and Chrysler Corporation, the corporate predecessor of the Company. On November 30, 1986, the Internal Revenue Service issued an exemption letter to the Center, setting forth the Center's tax-exempt status under Section 501(c)(5) of the Internal Revenue Code. (See Exhibits: "Constitutive Documents" Items 1, 2 and 3.)

As indicated in the MOU, the object of the Center is to facilitate cooperation between UAW and the Company across a broad range of activities, specific types of which have over the years been added to or removed from the Center's mssion. Currently the following activities, each of which is discussed and explained in greater detail below and in relevant exhibits to this letter, are conducted through or under the auspices of the Center (each separate activity will be referred to hereafter as an "Activity"):

- New Hire Orientation
- Publications
- Artist at Work Exhibition
- Diversity Activities
- Workplace Violence Prevention
- World Class Manufacturing Academy ("WCMA")
- Health and Safety Training and Research
- Tuition Assistance Program ("TAP")
- Circle of Life Network
- Employee Assistance Program ("EAP")
- Miscellaneous *ad hoc* additional conferences

Other activities which have in the past been conducted by the Center, but are not being conducted currently, are:

- Apprenticeship Program (discontinued approximately 2003), which provided opportunities for employees to gain certification in skilled trades.
- Product Quality Improvement Partnership (discontinued 2009), which involved *ad hoc* instructional sessions conducted by at local facilities, including Company manufacturing

Page 3
October 20, 2014

> plants and other facilities, intended to to improve the quality of Company goods and
> services.
> • Regional Training Centers

The Center is financed exclusively by means of monthly cash transfers made directly by the Company. Employees do not contribute to the Center's finances, either by wage withholding or otherwise. The amount of each month's Company contribution to the Center is intended to reflect as closely as practicable the Center's expected expenses for the immediately ensuing month. Pursuant to a letter agreement signed February 17, 2009, the Company and UAW, "the costs associated with running the Center are now reduced to expense based draw requests."[1] (In a second letter agreement, dated May 2, 2011, the Company and UAW reiterated the continuing effect of this arrangement for an additional eight-year period, through the term of the 2015 collective bargaining agreement between the Company and the Center.)

Accordingly, the Center does not accumulate financial assets over time; its available cash is managed so as typically to represent the amount necessary, as of any given date, to meet its expected outlays for approximately the next 30-60 days. UAW, the Company and the Center periodically confer to adjust or redetermine the basis for monthly transfers so as more closely and immediately to reflect the Center's actual monthly needs. (In addition, the Company and the Center occasionally agree upon new joint programs or initiatives and, in such cases, adjust the monthly fund transfers to reflect the cost thereof.)

Exhibits regarding "Funding," attached to this letter, contain detailed account statements which evidence the pass-through effect of this financing system for March through August of 2014, which is a representative period.

With respect to those Activities for which "participation" has meaning, individuals participate by virtue of their status as employees of the Company. The Center does not believe employees have any legal right to sue or otherwise enforce directly against the Center their right to participate in any Activity.

## DISCUSSION

### Legal Authorities

Section 3(3) of ERISA defines an "employee benefit plan" as a plan that is either an "employee welfare benefit plan" or an "employee pension benefit plan" or both. There does not appear to be any question that neither the Center nor any of its Activities is a "pension plan" within the meaning of ERISA. Therefore, the central issue for present purposes is whether the Center or an Activity is an "employee welfare benefit plan" within the meaning of ERISA.

---

[1] Originally, pursuant to the MOU, the Center was financed in part by reference to amounts made available under a definite formula based on overtime hours worked by members of UAW. Pursuant to the above-referenced subsequent letter agreements between the Company and UAW, however, this arrangement was changed to the purely expense-based approach described above, which continues in effect today.

Page 4
October 20, 2014

ERISA Section 3(1) defines "employee welfare benefit plan" as follows:

(1) The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise,

(A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or

(B) any benefit described in section 186 (c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

The above reference to benefits described in Section 186(c) of Title 29 refers to Section 302(c) of the Labor Management Relations Act ("LMRA"). As has been provided by regulation promulgated by the Department of Labor ("DOL"):

Section 302(c) of the LMRA lists exceptions to the restrictions contained in subsections (a) and (b) of that section on payments and loans made by an employer to individuals and groups representing employees of the employer. Of these exceptions, only those contained in paragraphs (5), (6), (7) and (8) describe benefits provided through employee benefit plans. Moreover, only paragraph (6) describes benefits not described in section 3(1)(A) of the Act. The benefits described in section 302(c)(6) of the LMRA but not in section 3(1)(A) of the Act are "* * * holiday, severance or similar benefits". Thus, the effect of section 3(1)(B) of the Act is to include within the definition of "welfare plan" those plans which provide holiday and severance benefits, and benefits which are similar (for example, benefits which are in substance severance benefits, although not so characterized).
DOL Reg. 2510.3-1(a)(3).

The ERISA definition has been elaborated in various court decisions, as well as DOL guidance. In the seminal case of *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982), the Court of Appeals for the Eleventh Circuit held that:

[A] "plan, fund, or program" under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits. To be an employee welfare benefit plan, the intended benefits must be health, accident, death, disability, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits; the intended beneficiaries must include union members, employees, former employees or their beneficiaries; and an employer or employee organization, or both, and not individual employees or entrepreneurial businesses, must establish or maintain the plan, fund, or program.
*Id.* at 1373.

Page 5
October 20, 2014

The *Dillingham* case involved the purchase of insurance; the Court of Appeals held that the insurance company or policy was itself at most only "a method of implementing a plan, fund, or program … but is not itself a plan." *Id.* at 1375.

All the other U.S. Courts of Appeals, including the Court of Appeals for the Sixth Circuit, whose jurisdiction includes the Center, have adopted the *Dillingham* analysis for determining the existence of a "plan, fund or program." See *Int'l Resources Inc. v. New York Life Ins. Co.*, 950 F.2d 294 (6th Cir. 1992); *Hughes v. Zurz*, unpublished decision, 298 Fed. Appx. 404, 2008 U.S. App. LEXIS 24758 (6th Cir. 2008).

Federal courts have also considered the meaning of the terms "fund," or "funded," in the context of determining whether a welfare benefit plan exists within the meaning of ERISA. For example, in *Wright Elec. v. Minn. State Bd. of Elec.*, 2002 U.S. Dist. LEXIS 5783, 27 EBC 2533 (D. Minn. 2002); *aff'd* 322 F.3d 1025 (8th Cir. 2003), the court determined that an employer's apprentice plan, financed through a separate foundation whose expenses were borne by the employer, was not "funded" because the foundation did not generally accumulate assets, but rather simply served as a pass-through financing entity. The court concluded that "This type of funding scheme is simply not the kind that Congress intended to sanction through ERISA." *Id.* at 16. *Wright*, and additional cases involving similar circumstances, are discussed in greater detail below in the context of the Center's tuition assistance ("TAP") Activity.

### Summary Analysis

None of the Activities conducted through the Center constitutes an "employee benefit plan" under ERISA under the above authorities. Even if any Activity were an employee benefit plan within the meaning of ERISA, that would not mean the Center, itself, is a "plan" under ERISA. The Center is an organization that carries out a cooperative protocol between the Company and UAW. As with the insurance policy at issue in the *Dillingham* case, the Center could, as a matter of logic, at most be only "a method of implementing a plan, fund, or program … not itself a plan."

A number of Activities, such as Publications or Diversity Activities, clearly do not involve the extension to any employee or beneficiary of anything that could be characterized as an "employee benefit" within the meaning of ERISA. These include, most straightforwardly, such Activities as Publications or Diversity Activities. Other Activities, such as health and safety training, for example, involve employee instruction on matters immediately relevant to proper performance of employees' jobs. These Activities are analogous to any employer's instructing any employee as to how he or she is expected to perform his or her assigned tasks – simply formalized in the present case, and on a large scale. Such instruction cannot be characterized as an "employee benefit" within the meaning of ERISA.

To the extent any Activities could be characterized as extending such a benefit such as "training," they do not meet the definition of a "plan, fund or program" under the *Dillingham* test. The WCMA, for example, involves *ad hoc*, single-purpose training events as requested by the Company. In no sense would those "benefits," if they are such, be reasonably ascertainable in advance.

Page 6
October 20, 2014


The Center itself, meanwhile, is simply an establishment for administering and facilitating the Activities, and is in no sense itself a "plan, program or fund," as interpreted in the above authorities. It is not a "plan": ascertainable "Center benefits" do not exist. Nor is the Center a "fund:" No money is accumulated for employee benefit plan purposes, and no employee or beneficiary has any interest in Company or Center funds pursuant to any Activity. As discussed further, below, in the context of TAP, the case authority and the DOL's own guidance, outlined above, preclude the conclusion that a "pass-through" entity such as the Center could give rise to a "funded" plan.

We also note the existence of another potentially relevant regulatory provision, DOL. Reg. 29 CFR §2510.3-1(b)(i), which provides:

> (i) *Industry advancement programs*. For purposes of Title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a program maintained by an employer or group or association of employers, which has no employee participants and does not provide benefits to employees or their dependents, regardless of whether the program serves as a conduit through which funds or other assets are channelled to employee benefit plans covered under Title I of the Act.

This exception appears to apply by its terms to all or most of the Center's Activities.

**Detailed Analysis by Activity**

A number of the Center's Activities can be ruled out fairly immediately, in the Center's view, as employee benefit plans within the meaning of ERISA. These most evident cases are discussed first as a miscellaneous group, below.

A second category of Activities that are instructional in nature – WCMA and Health and Safety Training and Research – are discussed next.

The remaining three Activities –Tuition Assistance Program, Circle of Life Network, and Employee Assistance Program – bear individualized analysis and are discussed in turn after the discussion of the other Activities.

MISCELLANEOUS ACTIVITIES

*1. New Hire Orientation:* The Center conducts 1-2 day orientation sessions for newly hired Company hourly employees represented by UAW who are based in the southeast Michigan region. (Other new employees receive orientation provided by their local Company plants.) These sessions are typically held at the Center or at the NTC's specially dedicated WCMA facility in Warren, Michigan.

*2. Publications*: The Center produces several employee-oriented publications, including *Tomorrow* Magazine, on an *ad hoc* basis (*Tomorrow* being published on roughly a quarterly schedule).

*3. Artist at Work Exhibition*: This is an annual Activity pursuant to which Company employees are invited to submit works of art they have created to a jury of art judges; winning artwork is exhibited at the Center and at the WCMA facility in Warren, Michigan.

Page 7
October 20, 2014

   *4. Diversity Activities*: The Center conducts 1-2 day training sessions on developing and valuing diversity within the workplace, including sensitivity training aimed at gender, racial and other issues. These sessions are *ad hoc* in nature; can involve selected employees from a variety of sites or occasionally an entire plant or shift.

   *5. Workplace Violence Prevention Program*: Similarly to its Diversity Activities, the Center conducts 1-2 day, "train-the-trainer" sessions aimed at reducing the risk of workplace violence. Like the Diversity Activities, these sessions are *ad hoc* in nature and typically involve selected employees selected to participate from specific plants, and who are expected to put in place in their plants the techniques learned at the Center.

   *6. Miscellaneous Other Conferences and Events Coordinated by the Center:*

- Youth School-to-Work Program
- Union and Company Awareness Program
- Employee Participation Conference
- Ergonomics Classes
- Health Awareness Conference
- Local Training Facilitator Program
- National Paid Education Leave Program

   In the Center's view, none of the above Activities involves the threshold concept of an "employee benefit" within the meaning of ERISA – let alone an employee benefit "plan, fund or program." In particular, none of these Activities provides even arguably, in the Center's view, any of the benefits in the enumerated list in ERISA Section 3(1).

## INSTRUCTIONAL ACTIVITIES

   *1. World Class Manufacturing Academy ("WCMA")*: The WCMA refers to facilities and programs administered by the Center to train hourly Company employees as to machinery and equipment as part of Company operations. Such training occurs either at the Center itself, at Company plants or at the NTC's specially dedicated WCMA facility in Warren, Michigan.

   *2. Health and Safety Training and Research*: The Center conducts, on an *ad hoc* basis as needed, training sessions designed to improve employee health and safety. Such sessions can involve "train the trainer" events, designed to prepare specific plant employees to convey safety information to other employees; group training sessions; or, in some cases, entire plants and shifts.

   In the Center's view, none of these instructional Activities involves the type of "training" that would rise to the level of an "employee benefit." As noted above, these Activities are analogous to any employer's instructing an employee as to how he or she is expected to perform his or her job. Because of the size and scale of the Company's operations, such instruction has been formalized and centralized, in many cases, with the Center. The Activities involve, as indicated, simple guidance as to how to perform an employee's duties – not "training" that can lead, for example, to a new career or more advanced job specification. For these Activities to be considered "employee benefits," any instruction by an employer to an employee as to job performance would have to be so considered; and plainly that was not Congress's intent.

Page 8
October 20, 2014

Even if these instructional Activities did involve an "employee benefit" within the meaning of ERISA, they would not constitute a "plan, fund or program" under the *Dillingham* analysis discussed above. They do not involve any standing program or document that an employee could consult or cite by way of "claiming" any right to instruction. The programs are, as indicated, conducted on an *ad hoc* – but usually mandatory – basis as necessary for smooth Company operations. Accordingly there would be no way to "ascertain the intended benefits," as required under *Dillingham* in order to be an employee benefit plan.

ADDITIONAL ACTIVITIES

***1. Tuition Assistance Program ("TAP")*:** The Center administers the TAP, pursuant to which eligible Company employees can receive Company-paid tuition, for qualifying classes offered by eligible educational instutions.

Such plans are not subject to ERISA. Department of Labor Regulation §2510.3-1(k) excludes from the definition of "employee benefit plan":

> (k) *Unfunded scholarship programs.* For purposes of title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a scholarship program, including a tuition and education expense refund program, under which payments are made solely from the general assets of an employer or employee organization.

This exclusion applies to the TAP administered through the Center. Like all other Activities, the TAP is not "funded," within the meaning accorded that term under ERISA. Money for this Activity is not segregated; no participant has any right to any assets of the Center (or of the Company) with respect to this Activity. Amounts required to provide reimbursement under the TAP are simply forwarded, within approximately a month of the need,[2] to the Center, whose role is at most as an "administrator" of the Plan.[3] There is no authority for treating such an arrangement, where the employer forwards its own unsegregated assets to an administrator for the short-term purpose of administering benefits, as "funded" – and indeed, doing so would be tantamount to regarding any third-party plan administrator as itself an ERISA "plan."

As described above, in *Wright Elec. v. Minn. State Bd. of Elec.*, 2002 U.S. Dist. LEXIS 5783, 27 EBC 2533 (D. Minn. 2002), the District Court concluded that a separate foundation financed on a "pass-through" expense basis could not constitute a "fund" within the meaning of ERISA – and this conclusion was reached despite the fact that the contributions in question, in contrast to the Center, involved employee contributions.

---

[2] We note that, in Regulation 29 C.F.R. § 2510.3-102c), the DOL has provided that participant contributions to a welfare benefit plan will be considered "plan assets" – which must be segregated in trust or used to pay benefits or defray plan expenses – no later than 90 days after their receipt by the sponsoring employer. This Regulation is not directly applicable to the present case (it involves participant contributions, of which the Center receives none), and the 90-day period is a maximum, "unsafe harbor." The provision nonetheless suggests the DOL's view that holding assets as long as 90 days is consistent with the conclusion that assets are not being "accumulated" in a manner sufficient to invoke the requirements of ERISA.

[3] Until 2012 TAP checks were not in fact written by the Center. Instead the Center simply issued a request to the Company to issue checks directly to educational institutions. For administrative convenience this arrangement was changed in 2012 to the current system by which Chrysler provides the money for distribution by the Center.

Page 9
October 20, 2014

The analysis also follows from judicial authority and DOL guidance concerning "advance and recapture" vacation arrangements, which were presented in a series of cases in which employers attempted to circumvent state vacation-pay laws by "funding" vacation plans on a pay-as-you-go basis through a separate trust. Courts and the DOL concluded that such arrangements were not "funded" within the meaning of ERISA, even in situations where employers maintained meaningful assets in the trust, and trust funds were required by their terms to be used only to pay or reimburse the employer for vacation benefits. As stated by the DOL in a 2004 Advisory Opinion Letter on the subject:

> The fact that the Trust documents may be read to impose a legal obligation on [the employer] to contribute amounts every two weeks sufficient to pay vacation wages as they become due, and the fact that [the employer] may voluntarily maintain a minimum balance of $250,000 in the Trust does not, in the Department's view, operate to change the *essential nature of the Trust as a mere pass-through vehicle* for the employer's payment of ordinary vacation wages or result in the Trust constituting a separate fund that provides genuine protections for the approximately $8 million in benefits that accrue under the plan each year.
> DOL Advisory Opinion 2004-08A (July 2, 2004) (emph. added).

With respect to a similar arrangement, where a relatively low balance was maintained in the trust, the U.S. Court of Appeals for the Ninth Circuit stated that:

> Under this scenario, the employee is relying on the financial health of [the employer], not that of the trust, for his or her regular sick leave payments. "If there is a danger of defeated expectations, it is no different from the danger of defeated expectations of wages for services performed - a danger Congress chose not to regulate in ERISA."
> *Alaska Airlines v. Oregon Bureau of Labor*, 122 F.3d 812 (1997) (quoting *Massachusetts v. Morash, 490 U.S. 107, 115 (1989).*

*See also Czechowski v. Tandy Corp.*, 731 F. Supp. 406, 408 (N.D. Cal. 1990) (emphasizing that the trust at issue was not subject to ERISA "since no funds are accumulated in it."); *Shrivastava v. Fry's Elecs.*, 2011 U.S. Dist. LEXIS 96714 (N.D. Cal. 2011); *Gilbert v. Securitas Sec. Servs.*, 2007 U.S. Dist. LEXIS 102412 (C.D. Cal. 2007).[4]

It should be noted that the above authorities ruling out the existence of a "fund" all involved the establishment of an actual formal *trust*, against the assets of which an employee would have directly legally enforceable rights – in marked contrast to the situation with the Center. As acknowledged by the above courts, as well as the DOL, to conclude that a "fund" within the meaning of ERISA exists where expenses of a pass-through entity – even a trust – are advanced on a pay-as-you-go basis would give rise to the opportunity, which the employers in the above cases all sought to

---

[4] These "advance and recapture" cases all involved situations where benefits were directly paid by the employer, followed by reimbursement of the employer from the trust. But that is a formal difference from the Center, involving only the sequence and routing of fund-flow. The economic substance, under which no assets are "accumulated," is the same; with the crucial differences that the Center does not even constitute a trust and employees have no legally enforceable rights against it with respect to benefits. Even more so than in the cases above, employees must effectively look exclusively to the employer for security as to financing of Activities.

Page 10
October 20, 2014

seize, of avoiding the application of protective state laws through the adoption of a merely formal arrangement. Further, concluding that pass-through reimbursement of the expenses of a third party through which benefits are offered gives rise to a "fund" would also, as noted above, require concluding that any benefit program administered through a third-party administrator, or TPA, is therefore by definition "funded," an intolerable result.

Finally, whatever the analysis under the above regulation, it is questionable whether education benefits such as those provided under the TAP are even "employee benefits" within the meaning of ERISA. At least one Court of Appeals has held that they are not. *Kemp v. IBM,* 109 F.3d 708, 713-14 (11th Cir. 1997). That conclusion is consistent, for instance, with historical tax authorities pursuant to which education benefits provided to assist an employee in performing his or her duties have been held not to constitute "wages." (See, for example, Internal Revenue Service Revenue Ruling 76-71, 1976-1 Cum. Bull. 308.) As discussed with regard to the instructional Activities above, this result simply makes sense: Education or instruction undertaken to assist an employee in performing his or her assigned duties is not in its essence a compensatory "employee benefit." This type of education or instruction involves, effectively, informing an employee how to do his or her job, not compensating the employee for doing that job.

**2. *Circle of Life Network*:** This Activity involves a collection of alliances with local providers as to such things as child/elder care, to which the Center can refer Company employees for assistance with family care and similar issues. The Activity also includes a dependent care assistance program, or "DCAP." As the Department has indicated, an unfunded DCAP limited to reimbursement of dependent care services freely chosen by each participating employee, rather than the employer's provision of any specific day care center, is not the type of benefit described in ERISA Section 3(1) and thus does not constitute an employee welfare benefit plan within the meaning of section 3(1) of Title I of ERISA. See D.O.L. Adv. Op. 93-25A (Sept. 3, 1993). This description applies to the DCAP provided through the Circle of Life Activity. (For further analysis of "unfunded" status, see also the discussion above concerning the TAP.)

**3. *Employee Assistance Program ("EAP")*:** The EAP, administered through the Center, provides referrals intended to assist employees who encounter personal or family-related issues, including substance-abuse and other problems. The EAP is, like the other Activities, unfunded as described above, and involves referrals to qualified counselors rather than the direct provision by the Center of counseling or other treatment. Accordingly the EAP is not an "employee benefit plan," as indicated by the Department of Labor in advisory guidance concerning employee assistance programs. See, e.g. D.O.L. Adv. Op. 88-04A (March 11, 1988).

Even were the EAP an employee benefit plan, the Center does not itself provide referrals or any other direct employee services under the EAP. Instead the Center's role is limited to a "train the trainer" function whereby the Center furnishes initial and continuing training to those local UAW representatives who are tasked with staffing the EAP, and whose salaries are entirely paid, directly, by the Company. The Center arranges and hosts training at its facilities for the those reprepresentatives, advancing or reimbursing their transportation and hotel costs from the amounts received by the the Center from Company on the monthly basis described above. The Center does not "administer," and certainly cannot be itself regarded as, the EAP.

Page 11
October 20, 2014

## CONCLUSION

In summary, for the reasons discussed above, neither the Center nor the activities conducted through the Center are "employee benefits plans" within the meaning of ERISA. Accordingly EBSA does not have jurisdiction to conduct an investigation.

If you have any questions, please feel free to contact me at the number given above.

Very truly yours,

STEVENSON KEPPELMAN ASSOCIATES

Andrew W. Stumpff

AWS/kmz
Attachments
cc:     Jerome Hill, UAW Chrysler National Training Center
        L. Joe Rivers, Regional Director, Employee Benefits Security Administration
        Meghann Wilkinson, Employee Benefits Security Administration