UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ALPHONS IACOBELLI,

    Defendant,

UAW-CHRYSLER STILL DEVELOPMENT
and TRAINING CENTER PROGRAM (NTC)

    Petitioner

_____/

Crim. No. 17-20406
Misc. No. 18-51223

Paul D. Borman
United States District Judge

FILED
APR 05 2019
CLERK'S OFFICE
U.S. DISTRICT COURT
EASTERN MICHIGAN

ORDER DENYING PETITIONER NATIONAL TRAINING CENTER'S (NTC)
REQUEST FOR "VICTIM" DESIGNATION

Petitioner NTC claims that it is a "victim" of the Taft-Hartley Act criminal conspiracy violations that resulted in a loss of its funds. NTC seeks recognition as "victim" status in the instant criminal case against Defendant Alphons Iacobelli.

On January 22, 2018, Defendant Iacobelli pled guilty to Count I, Conspiracy to Violate the Labor Management Relations Act (Taft Hartley Act), between 2009 and 2015, by conspiring with FCA and some of its executives and employees to deliver more than $1.5 million in prohibited payments and items of value to officers and employees of the United Auto Workers Union (UAW). These payments included improper use of NTC-

1

issued credit cards, and other items using FCA funds. He stated that he was acting in the interest of FCA. Defendant Iacobelli also pled guilty to the Count 7 federal tax violations, and agreed to restitution to the U.S. Treasury of $835,523.00.

Petitioner NTC asserts that "the UAW-Chrysler Skill Development and Training Program is a joint labor management committee which has provided a variety of training, health and safety and other employee assistance programs to tens of thousands of FCA US LLC employees represented by the UAW." NTC Brief (ECF #3) P.1. NTC further contends that because it is a separate entity, apart from FCA and the UAW, it is entitled to "victim" status.

Defendant Iacobelli served as the principal FCA member of the NTC for many years. NTC funds were provided by FCA, and then disbursed by NTC. NTC asserts:

> "Defendant Iacobelli has pled guilty to authorizing prohibited
> payments and other items of value to officers and employees
> of the UAW, and FCA Chrysler executives, and to himself.
> These improper payments came from NTC bank accounts and
> credit card accounts. Those misappropriated funds were
> provided to the NTC by FCA pursuant to a labor contract
> between FCA and the UAW.

The issue before the Court is whether the NTC was a victim of Defendant Iacobelli's criminal actions, or whether it was a co-conspirator that colluded with FCA, the UAW and Defendant Iacobelli in those improper payments, and therefore not entitled to victim status.

The Court has received extensive briefing on this restitution issue from NTC, the United States and Defendant Iacobelli. The Court held a hearing on Petitioner NTC's Motion for Restitution on February 1, 2019, and then ordered post-hearing supplemental briefing by the parties. Transcript February 1, 2019 Hearing on Petitioner NTC's Motion for Restitution (ECF #18) Pp. 64-65.

The NTC seeks "full and timely restitution as provided by the CVRA, 18 U.S.C. § 3771(a)(6) and the MVRA, 18 U.S.C. §3663A(a)(1). . . ." (ECF #3) 8-22-18 Motion P.1.

The MVRA states in §3664(e): "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government . . . ."

The Court concludes that during the time period at issue in this conviction, 2009-2015, the NTC functioned as a willing co-conspirator with FCA and the UAW to pass through FCA funds to the NTC to be distributed, *inter alia*, to co-conspirators/defendants who colluded with the NTC officials in authorizing the illegal payments/credit card expenses. Thus, the Court finds that the NTC was in active collusion with Defendant Alphons Iacobelli.[1]

---

[1] The Court notes that in 2018 the NTC a/k/a the UAW-Chrysler Skill Development and Training Program, a Michigan non-profit corporation, filed a state court civil action in Oakland County alleging fraud by *inter alia* Defendant Iacobelli and his wife, based upon his FCA/NTC activities. Case #2018-166226-CZ.

3

The Court finds significant, in supporting its conclusion that NTC was not an independent entity entitled to "victim" status, the 2007 and 2011 Memoranda of Understanding, (MOU) on Joint Activities (M-9's) between FCA and the UAW that covers the time period in the conspiracy charge in Defendant Iacobelli's indictment (2009-2015).

As the Government noted in its Response to the NTC's Supplemental Brief, ECF #20, 3-1-19, Page ID 379-80.

> B. The NTC Suffered No Pecuniary Loss.
>    1. The Company's Only Obligation Was to
>       "Make Available Funding."
> The 2007 and 2011 Memoranda of Understanding on Joint Activities (commonly known as "M-9s") between the Company and the UAW govern the time period in the conspiracy set forth in Iacobelli's indictment (2009 to mid-2015). The operative language is that "the *Company will make available funding*" at a specified rate of five cents per hour worked. NTC EX. 2 at Pg ID 274; NTC Ex. 3 at PgID 283-284; *see also id.* ("the Company will make available additional funding" in connection with overtime hours worked).[2] Notably, the M-9s do not designate the NTC as the entity to whom the Company must make funding available. All the Company had to do under the M-9 was "make funding available" upon request. This was nothing more than a potential obligation until the draw request was made. FCA accounted for this potential obligation by booking the monthly nickel fund allocation as an expense and recording it as a liability on its balance sheet. When the NTC made draw requests and money was paid out from FCA's general cash account, the liability decreased.

---

[2]At oral argument, the Court suggested that the Company "got a nickel back from all the employees." Hrg. Tr. at 56. To clarify, a nickel per hour worked was never docked from employee paychecks to fund the NTC. Rather, the Company "made available" its own income.

4

Further, as the Government Response also noted:

> 3. The Company and the UAW Had the Exclusive Authority to Dispose of Unused Funds.
>
> The M-9s state that the UAW maintain the exclusive authority to decide how to distribute any surplus funds:
>> After reconciliation of claims, commitments, and accruals through the expiration date of the new National Agreement, remaining National and Reservoir Funds *shall be disposed of in such a manner as the parties shall agree* consistent with the objectives of this Memorandum.
>
> NTC Ex. 2 at PgID 275; NTC Ex. 3 at PgID 285 (emphasis supplied). Likewise, the Company and the UAW had the express power to discontinue any part of the M-9 if they so agreed, as well as make adjustments and modifications to it. *See* NTC Ex. 2 at PgID 275, 277; NTC Ex. 3 at PgID 286, 288; NTC Ex. 4 at PgID 295, 299.

ECF #20 at PgID 381-82. The Court agrees with this response language.

The Court also agrees with the Government's assertion, supported by correspondence from the NTC's benefits advisor, Stevenson Keppleman, to the Government, during a 2014 Department of Labor investigation to determine whether the NTC was an "employee benefit plan" under ERISA, that NTC disclaimed ownership of the funds that FCA provided to NTC. The October 20, 2014 letter from Stevenson Keppleman to the Government, states in pertinent part:

> We are writing [to the Federal Employee Benefits Security Administration] on behalf of our client UAW-Chrysler National Training Center . . . . [I]t is the Center's position, based on the factual circumstances concerning its structure and operation, that the Center is not an "employee benefit

5

> plan" within the meaning of ERISA . . . the Center exists as <u>part of a protocol</u> for cooperation between International Union . . . (UAW) and Chrysler Group in conducting various activities, none of which, nor the Center itself, constitutes an employee benefit plan.

Government Response to the NTC's Supplemental Brief (ECF #20-2) 3-1-19, Exh. E, Page ID 389 (emphasis added), October 20, 2014 letter from NTC advisor Stephenson Keppelman to the Federal Employee Benefits Security Administration. The letter continues in pertinent part:

> The Center is financed exclusively by means of monthly cash transfers made directly by the Company. <u>Employees do not contribute to the Center's finances, either by wage withholding or otherwise.</u> The amount of each month's Company contribution to the Center is intended to reflect as closely as procurable the Center's expected expenses for the immediately ensuing month. Pursuant to a letter agreement signed February 17, 2009, the Company and UAW, "the costs associated with running the Center are now reduced to expense-based draw requests.
>
> Accordingly, the Center does not accumulate financial assets over time; its available cash is managed so as typically to represent the amount necessary, as of any given date, to meet its expected outlays for approximately the next 30-60 days.

*Id.* at Page ID 391. (emphasis added)

The Court concludes that this clearly establishes that the protocol between FCA and the UAW established that the parties intended to, and did use the NTC as a pass through for FCA funds to pay for a contracted-for program that its 100% funded by FCA pursuant to an FCA-UAW labor agreement. The NTC does not contain a fixed corpus or

6

assets, and is not a trust. The NTC is a joint enterprise between FCA and the UAW, created for their mutual benefit and under their total control. If FCA and the UAW exercised their authority under the M-9 to discontinue the NTC, it would cease to exist. At the same time, the NTC's Joint Activities Board, of which Defendant Iacobelli was a member, did have the authority to conduct NTC's daily operations, including making of the improper donations and payments that formed the predicate of the NTC's liability as a co-conspirator in the Taft-Hartley Act violations with the many prosecuted NTC employees and board members, including Defendant Iacobelli.

The Court finds relevant a recent decision by U.S. District Judge J. Paul Oetken of the Southern District of New York, *United States v. Block*, 2018 WL 722854, 16-CR-595 (JPO), February 6, 2018. In *Block*, the Defendant's former employer corporation sought restitution against him. The Court concluded that because the corporation "is more accurately regarded as a co-conspirator than a 'victim' of Black's crimes, Vereit's request for restitution is denied." Black at P.1.

Judge Oetken's opinion began with a principle that is uncontroverted:

> Co-conspirators cannot he 'victims' under the restitution statutes: the Mandatory Victim Restitution Act, 18 U.S.C. §3663A (MVRA), and the Victim and Witness Protection Act, 18 U.S.C. §3663. That is so, because it would be a fundamental error to enter an order that requires "restitutionary" payments to the perpetrator of the offense of conviction. See *United States v. Reifler*, 446 F.3d 65, 127 (2d

7

Cir. 2006).[3]

Judge Oetken noted in *Block*, that as in the instant case:

> It might be tempting to focus on Vereit as if it were a completely different entity from the old ARCP. To be sure, after the accounting scandal of 2014, ARCP cleaned house. The company replaced Board members and its senior management team . . .
> But all of that happened <u>after</u> the period of criminal conduct in this case.
>
> . . . .
>
> The question is not whether the company transformed itself into a victim, but whether it was genuinely a victim – as opposed to a co-conspirator – at the time of the crimes. The Court concludes that it was not a victim.

*Block* at P.5. In the instant case, NTC's "cleaning house" after its criminal conduct was discovered, occurred after the period of criminal conduct at issue in the case. Thus, as in *Block*, NTC's transformation, "presto chango", does not result in a metamorphosis creating a genuine victim.

This Court concludes that, as in *Block*, NTC was a co-conspirator, and not genuinely a victim at the time of the crimes at issue in *United States v. Alphons Iacobelli*.

---

[3]As Circuit Judge Amalya Kearse stated in the Second Circuit's opinion in *United States v. Reifler*:
> [A]ny order entered under the MVRA that has the effect of treating co-conspirators as "victims", and thereby requires "restitution" payments to the perpetrators of the offense of conviction, contains an error so fundamental and so adversely reflecting on the public reputation of the judicial proceeding that we may, and do, deal with it *sua sponte*.

*Reifler* at 127.

Accordingly, the Court DENIES Petitioner NTC request for victim status in this case.

SO ORDERED.

DATED: APR 0 5 2019

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE